UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 09-11800-RWZ


PATRICIA PINA

v.

THOMAS MORRIS, *et al.*


MEMORANDUM OF DECISION

March 28, 2013

ZOBEL, D.J.

Plaintiff Patricia Pina brought this action against defendants Thomas Morris and

Janice Boyle pursuant to the Federal Civil Rights Act, 42 U.S.C. § 1983, and the

Massachusetts Civil Rights Act, Mass. Gen. Laws. ch. 12 § 11I, for violations of her

federal and state constitutional rights.  Plaintiff alleges that as part of their duties in

enforcing the conditions of her probation, defendants conducted illegal warrantless

searches of her property without reasonable suspicion.  On January 16, 2013, following

a three-day trial, the jury returned a verdict in favor of defendants.  Pending before the

court is plaintiff's renewed motion for judgment as a matter of law or, in the alternative,

a new trial (Docket # 82).

**I.  Background**

In April 2007, plaintiff was convicted after jury trial in the Wareham District Court

of 45 counts of animal cruelty for keeping malnourished horses, several of which

subsequently died, at her property in Plymouth County.  She was sentenced to two

concurrent one-year terms of imprisonment and was incarcerated at MCI-Framingham.
As part of its sentence, the district court also imposed a period of probation with certain
conditions, including that plaintiff not have any animals in her care or possession and
that the Massachusetts Society for Prevention of Cruelty to Animals ("MSPCA") would
conduct inspections of plaintiff's property to ensure her compliance.

Plaintiff filed a motion with the Plymouth District Court seeking a ruling that
neither the probation department nor the MSPCA had the right to conduct suspicionless
searches of her property.  The district court did not rule on the motion.  However, in its
order affirming plaintiff's conviction and sentence, the Massachusetts Appeals Court
addressed the issue.  Commonwealth v. Pina, No. 08-P-133 (Mass. App. Ct. June 12,
2009).  Although the probation order did not specify a reasonable suspicion
requirement, that court "assume[d] that the [sentencing] judge was familiar with the law
requiring a probation officer to have reasonable suspicion before performing a
warrantless search, [ ] and that such a condition was impliedly part of the order of
probation here."  Id. (internal citation omitted).

Defendant Thomas Morris ("Morris") was at the relevant time the chief probation
officer of the Plymouth probation department.[1]  Defendant Janice Boyle ("Boyle") is the
assistance chief probation officer.  On October 26, 2009, plaintiff brought suit against
Morris and Boyle in both their individual and official capacities, alleging that defendants
unlawfully searched her home and/or barns without a warrant and without reasonable

---

[1] Morris retired from the department in October 2009.

2

suspicion that she was violating her probation conditions.[2]  A jury trial was held January

14-16, 2013.  Several witnesses, including plaintiff and both defendants, testified

regarding several visits by officers from the MSPCA and probation department to

plaintiff's property from June 2007 through August 2009.[3]

At the close of evidence, plaintiff orally moved for judgment as a matter of law

with respect to liability as to Morris, which I reserved.[4]  The jury then returned a verdict

in favor of defendants, finding that neither probation officer had violated plaintiff's

Fourth Amendment rights.[5]  Plaintiff, pursuant to Fed. R. Civ. P. 50(b), now renews her

motion for judgment as a matter of law with respect to Morris, asserting that the

undisputed evidence at trial demonstrated that he violated her rights.  In the alternative,

plaintiff seeks a new trial under Fed. R. Civ. P. 59, claiming that the jury's verdict is

against the weight of the evidence and that the court's instruction defining a "search"

was incomplete and erroneous.

## II.  Legal Standards

In reviewing a Rule 50(b) motion, "the court must draw all reasonable inferences

---

[2] Plaintiff also sued probation officer Monica Coven and acting chief probation officer Timothy Norris in their official capacities for injunctive relief from any future suspicionless searches.  MSCPA officer Lori Miranda was initially named a defendant in both her individual and official capacity, but was dismissed from the action by stipulation on December 21, 2010.

[3] Morris was unavailable to present live testimony at trial for health reasons.  Instead, relevant portions of Morris's videotaped deposition, taken December 12, 2012, were played for the jury.

[4] Defendants also moved for judgment as a matter of law as to both Morris and Boyle, which I reserved.

[5] A claim under the Massachusetts Civil Rights Act encompasses the same elements as a Fourth Amendment violation, with the additional requirement of the use of threats, intimidation, or coercion. Because the jury found for defendants on plaintiff's federal constitutional claim, it was unnecessary for it to reach a verdict on the state claim.

in favor of the nonmoving party" and "may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). A jury verdict can be set aside only when "the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party."  Malone v. Lockheed Martin Corp., 610 F. 3d 16, 20 (1st Cir. 2010) (quoting Rivera Castillo v. Autokirey, Inc., 379 F.3d 4, 9 (1st Cir. 2004)).  See also Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994) ("A judgment as a matter of law may be granted only if the evidence, viewed from the perspective most favorable to the nonmovant, is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome."); Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 75 (1st Cir. 2001) ("In the end, the jury's verdict must stand unless the evidence, taken in the light most favorable to the prevailing party, points unerringly to an opposite conclusion.").

The standard under Rule 59 is less stringent.  A court       may grant a new trial when "the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice."  Ramos v. Davis & Geck, Inc., 167 F.3d 727, 731 (1st Cir. 1999) (quoting Velazquez v. Figueroa-Gomez, 996 F.2d 425, 427 (1st Cir. 1993)).  "When deciding to grant a new trial, a district court is free to independently weigh the evidence," Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009), and is not required to draw all inferences in favor of the verdict, id. at 439. However, "[a] motion for a new trial is not to be taken lightly" and should be granted only when "an error occurred in the conduct of the trial that was so grievous as to have

4

rendered the trial unfair." MacNeill Eng'g Co., Inc. v. Trisport, Ltd., 126 F. Supp. 2d 51,

63 (D. Mass. 2001) (internal citation and quotation omitted).

## III. Discussion

### A. Judgment as a Matter of Law

In light of the Massachusetts Appeals Court ruling, the probation officers here

were required to have consent or reasonable suspicion before performing a warrantless

search of plaintiff's property.  It is undisputed that Morris made several visits to

plaintiff's residence in order to assess her compliance with the probation condition

forbidding her from owning or possessing any animals.  At issue is whether any of

those visits involved an unlawful search of plaintiff's house or barns.[6]  Plaintiff does not

allege that Morris ever entered or searched her house, but contends that he repeatedly

entered and searched the barns for animals without her consent or any reason to

believe that she was violating the conditions of probation.

At trial, the parties presented evidence of six separate "visits" that Morris made

to plaintiff's property.  As to each instance, there was sufficient evidence for the jury to

conclude that Morris did not violate plaintiff's rights:[7]

---

[6] Plaintiff's barns are situated immediately to the left of her house.  I instructed the jury that plaintiff had a reasonable expectation of privacy in the barns and that they were protected by the Fourth Amendment.  Compare Rosencranz v. United States, 356 F.3d 310, 313 (1st Cir. 1966) (finding that a barn located next to the house fell within the "curtilage" and was covered by the Fourth Amendment) with United States v. Dunn, 480 U.S. 294, 300 (1987) (concluding that two barns located approximately 50 yards from a fence encircling residence and not used for intimate activities of the home lay outside the curtilage of the house).

[7] It is worth noting that the terminology employed by the witnesses and counsel during examinations was less than crystal clear.  While some testimony unequivocally indicated that a witness physically entered or searched through the barns, other terms such as "inspected" and "looked in" were more ambiguous.  For example, as highlighted in the testimony of Janice Boyle, infra, it was possible to look into a barn through open doors and check for the presence of animals visually without actually

5

### 1.  June 21, 2007

While plaintiff was incarcerated, Morris and MSPCA Officer Lori Miranda ("Miranda"), accompanied by two Plympton police officers, went to plaintiff's property on June 21, 2007.  Both Miranda and Morris testified, and entries in their respective activity logs confirmed, that no one was at the residence at that time.  When asked whether he had "look[ed] in the barns on that day," Morris responded that he "might have" and that he did not remember.  Morris Dep. Tr. 61.  No other evidence was presented indicating that Morris entered and searched the barns.  The jury could conclude that Morris did not conduct an unlawful search during this visit.

### 2.  June 22, 2007

Morris went back to the property the following day, June 22.  He testified that he went for a "home visit" to "see if [plaintiff] might be home."  Tr. 62.  As Morris pulled into the driveway, a man named "Fred" came out and identified himself as the caretaker for the property.  Morris told Fred that once plaintiff is released, no animals could be on the property.  Morris testified that aside from being in the driveway, he could not remember whether he went elsewhere on the property.  He stated that he "might have looked in the barns" or "may have just talked to Fred," but that he did not recall one way or the other whether he looked in the barns that day.  Tr. 64.  The jury could conclude that Morris did not search plaintiff's barns during this visit.

### 3.  November 1, 2007

---

physically entering the structure.  The jury was entitled to reasonably construe testimony using such ambiguous terms to conclude that no unlawful search occurred.

Morris went to the property with probation officer Monica Coven ("Coven") on November 1, 2007.  Plaintiff was still incarcerated on that date.  Morris could not recall this visit well but remembered that no one was home at the time.  Coven testified that Morris went up to the front door of the house and knocked, but no one answered. There was no evidence that Morris searched the barns.

### 4.  September 18, 2008

Morris visited the property with Miranda again on September 18, 2008.  Plaintiff had been released from incarceration and was home at the time.  Miranda testified that plaintiff answered the door and consented to a search of her home.  Miranda stated that she and plaintiff walked through the house together, which Morris's testimony confirmed, but plaintiff testified that she was kept at the front door by Morris while Miranda searched the house alone.  After Miranda searched the house, she entered and inspected the barns.  Plaintiff claimed that she and Morris accompanied Miranda during the search of the barns, but Miranda recalls that she searched alone while Morris and plaintiff remained outside in the driveway.  Morris could not remember whether he went through the barns that day.  The jury was entitled to disbelieve plaintiff's testimony that Morris searched through the barns and instead credit Miranda's testimony that Morris remained in the driveway during her search.

### 5.  July 6, 2009

On July 5, 2009, Morris was driving by the property when he noticed that the barn doors appeared to be in a different position than usual.  Morris testified that the doors were open when they had previously been closed, or vice versa, and his

probation log notes indicate that "one barn appears to be in use."  Suspecting potential

activity, he returned to the property the next day, July 6, with another probation officer,

Denise Pelchat.[8]  No one was home at the time.  Morris "looked in" the barns and saw

that one stall had been cleaned out, but there were no signs of animals.  Tr. 87-88.  To

the extent that Morris actually entered the barn during his visit, the jury could have

concluded that this "search" was justified by a reasonable suspicion that plaintiff was

violating the conditions of her probation given his observation a day earlier that one

barn appeared to be in use.

### 6.  August 10, 2009

Morris went to the property for a final time, accompanied by Boyle, on August 10,

2009.  Morris testified that the purpose of the visit was to "enforce a court order" and he

did not need any reason to believe that plaintiff was not complying with her probation

conditions.  Tr. 93.  Plaintiff was home at the time and at some point came out to meet

the probation officers in the driveway.  She testified that Morris and Boyle walked

around and searched inside her barns for approximately half an hour.  In contrast,

Boyle testified that it was a five-minute visit during which they drove up the driveway

and parked in front of a barn, checked for the presence of animals, had a short

conversation with plaintiff, and then left.  Boyle denied ever entering the barn or

conducting any searches; instead, because its doors were wide open, she could see

into the barn from the driveway and was able to verify that there were no animals

---

[8] When questioned why he chose to return the following day with Pelchat rather than stopping and inspecting the barns right away, Morris explained that he did not normally make home visits to female probationers by himself and wanted to have a female probation officer with him.

inside.  She also testified that Morris walked around to the side of the barn, but that she was not able to see where he went or what he did.  Morris could not recall whether the barn doors were open or closed and stated that he "inspected just the barns."  Tr. 94. Similarly, asked "on that visit with Janice Boyle, what part of the property did you go on?" Morris replied "[j]ust the barns." Tr. 37.

While this visit presented a closer case than the others, the evidence in plaintiff's favor was far from "overwhelming."  Boyle and plaintiff gave starkly different accounts of what occurred during the visit, and Morris's own memory of the events was murky.  It is unclear from his testimony whether in "inspect[ing]" the barns and "go[ing] on" the property of the barns, Morris actually entered the barns to search for animals. The jury could have concluded that Morris simply walked around the exterior of the barns or, like Boyle, observed the interior through open doors.  The evidence regarding this visit was not so one-sided as to require a determination that Morris violated plaintiff's rights.

Plaintiff points to several statements from Morris's testimony as clear evidence that he conducted searches in the barns.  Setting aside that these statements often used ambiguous terms such as "looked in," supra at n.7, many of the questions and responses were general or conjectural in nature and not specific to the instances alleged.  For example, when asked if he remembered where he went on the property during his first visit with Miranda and two Plymouth police officers, Morris replied instead that he once went with Miranda when plaintiff was home and without the police officers.  He then speculated, "But if that – well, if I went there and she wasn't there, I

9

just would have checked – knocked on the door, no response, gone and looked in the barns, and left." Tr. 27.  During another portion of questioning regarding where in the property he went during his June 22, 2007 visit when he encountered Fred, Morris answered that he "never went anyplace on that property except for the threshold of the back door" and answered affirmatively that it was "fair to say [his] testimony is [he] only went in the barns." Tr. 28.  But that response could be easily be read as a general answer reflecting that he may have entered the barns at some point in history – e.g., his July 6, 2009, visit after he had observed a change in the barn doors – and not that he went inside the barns on June 22, 2007.[9]  Asked whether he went through the barns with Miranda and Pina during the September 2008 visit, Morris responded that he did not remember and said, "I know if I went there by myself I always looked at the barns." Tr. 78.  Again, setting aside whether "looked at" signifies entry, this was a general and speculative response not necessarily reflective of what Morris actually did during the visit at issue.

The jury reasonably may have found that such statements were simply insufficient.  When the circumstances of each visit are examined closely, evidence of Morris's actions with respect to unlawfully entering and searching plaintiff's barns is inconclusive at best.  Accordingly, the jury's verdict must stand.

## B.  New Trial

Plaintiff seeks a new trial, claiming that the verdict is against the weight of the

---

[9]  Indeed, Morris's later testimony about the June 22 visit indicated that he could not recall whether or not he looked in the barns that day.

evidence and that the court gave an erroneous jury instruction.

### 1.  Weight of the Evidence

Plaintiff alleges that the evidence was "overwhelming" that Morris violated her rights.  I disagree.  As already discussed above, there were sufficient facts and credible evidence for the jury to find that Morris did not conduct unlawful searches of plaintiff's property.  Lama v. Bornas, 16 F.3d 473, 477 (1st Cir. 1994) ("[W]hen an argument that the evidence was insufficient forms the basis of a motion for a new trial, the district court is generally well within the bounds of its discretion in denying the motion using the same reasoning as in its denial of a motion for judgment as a matter of law.").  The verdict is not against the clear weight of the credible evidence nor has it resulted in a blatant miscarriage of justice.

### 2.  Jury Instruction

Although neither party initially proposed a jury instruction on the constitutional meaning of "search" in their pre-trial submissions, it became apparent after the close of evidence that one would be necessary.  I therefore instructed the jury that a search is a government intrusion upon "a reasonable expectation of privacy."  See Katz v. United States, 389, U.S. 347 (1967).  Plaintiff objected to that definition as incomplete, requesting an additional instruction that a technical trespass "with an intent to look" is also a "search" under the Supreme Court's recent decision in United States v. Jones, 132 S. Ct. 945 (2012).  I declined, finding that the "trespass" definition was inapplicable to the context of this case.  Moreover, Jones was handed down well after the relevant events and therefore could not have informed defendants' actions with respect to

11

plaintiff's property.[10]

Plaintiff now argues that the court's search instruction – while legally correct – was incomplete and created confusion with the jury. She claims that the court's refusal to give a "trespass" search instruction deprived her of a legitimate legal theory in the case; that is, the jury would have recognized defendants' actions as illegal searches under the Jones trespass theory even if it had not done so under a Katz privacy framework. To warrant a new trial, plaintiff must show not only that the challenged instruction "was misleading, unduly complicating, or incorrect as a matter of law" but also that it "adversely affected the objecting party's substantial rights." Sheek v. Asia Badger, Inc., 235 F.3d 687, 697 (1st Cir. 2000) (quoting Faigin v. Kelly, 184 F.3d 67, 86-87 (1st Cir. 1999)). See also First Act Inc. v. Brook Mays Music Co., Inc., 429 F. Supp. 2d 429, 432 (D. Mass 2006) ("Even if the objecting party shows the Court misstated the law, a new trial can be granted only if the Court's error affected the outcome of the trial."); Wilson v. Maritime Overseas Corp., 150 F. 3d 1, 6 (1st Cir. 1998) (errors in jury instructions are subject to harmless error review).

Plaintiff falls short of that standard. Even assuming that the jury should have been instructed on a "trespass" search per Jones, it is difficult to see how it would have made any difference. I already instructed the jury that plaintiff has a reasonable

---

[10] In Jones, the Supreme Court held that attaching a GPS device to a vehicle and using it to monitor the vehicle's movements constitutes a "search" under the Fourth Amendment because "the government physically occupied private property for the purpose of obtaining information." 132 S. Ct. at 949. Prior to Jones, the clear majority of federal courts had held that the government's installation and use of a GPS tracker was not a "search" under the theory that suspects have no reasonable expectation of privacy to their movements on public roads. The Jones Court's trespass-based ruling represented a significant shift away from the near-exclusive use of a privacy-based standard in defining Fourth Amendment searches.

expectation of privacy in her home and barns such that if a probation officer enters those buildings and looks around, he or she conducts a search.  A "search" under the requested <u>Jones</u> definition would have been functionally identical: a search occurs when a probation officer trespasses upon (i.e., enters) plaintiff's home or barns in order to obtain information.  In the specific circumstances of this case, plaintiff's property rights and expectation of privacy overlap, and the two search theories cover the same ground, so to speak.

However, plaintiff suggests, without much elaboration, that a trespass search instruction would have captured defendants' conduct beyond alleged entry into her home or barns.  It appears that she is challenging, as an illegal search, defendants' presence on her property *at all* to check compliance with probation conditions absent consent or reasonable suspicion.  Under that view, even if defendants did not go into plaintiff's home or barns but merely entered the driveway or other areas of her property, that would constitute a trespass-based search in violation of her rights.

But <u>Jones</u> does not go so far.  In fact, the <u>Jones</u> Court, in explicitly reaffirming the "open field" doctrine of <u>Oliver v. United States</u>, 466 U.S. 170 (1984), noted that the Fourth Amendment is not concerned with "*any* technical trespass that led to the gathering of evidence"; rather, it "protects against trespassory searches only with regard to those items ('persons, houses, papers, and effects') that it enumerates." <u>Jones</u>, 132 S. Ct. at 953 n.8 (emphasis in original) (internal quotations and citation omitted).  Thus, the government's information-gathering intrusion in a space that "is not one of those protected areas," though technically trespass at common law, "is of no

Fourth Amendment significance." Id. at 953.  Plaintiff has not shown – and, indeed,

never even raised the issue – that her driveway or other areas of her property beyond

her home and barns warrant constitutional protection.  Cf. United States v. Dunn, 480

U.S. 294, 300 (1987) (listing criteria for determining whether an area falls within the

constitutionally protected "curtilage" of the home).[11]  Defendants' presence in those

places, even "with an intent to look," would not have implicated the Fourth Amendment.

## IV.  Conclusion

Plaintiff's renewed motion for judgment as a matter of law or, in the alternative, a

new trial (Docket # 82). is DENIED.


_____March 28, 2013_____          _____/s/Rya W. Zobel_____
DATE                                RYA W. ZOBEL
                                    UNITED STATES DISTRICT JUDGE

---

[11] Although determining whether a given area falls within the curtilage "depends on the facts of a case," Rosencranz, 356 F.2d at 313, case law suggests that plaintiff's driveway – as it was described at trial – would not be considered protected property.  See e.g., United States v. Brown, 510 F.3d 57, 65-66 (1st Cir. 2007) (finding no Fourth Amendment protection for a long driveway where owners "had erected no barriers, had posted no signs, and had taken no other action to prevent or discourage public entry"; "If the relevant part of the driveway is freely exposed to public view, it does not fall within the curtilage."); United States v. Roccio, 981 F.2d 587, 591 (1st Cir. 1992) ("[T]here is no expectation of privacy in a driveway that is exposed to the public."); United States v. Rogers, No. Crim. 03-10313-RGS, 2005 WL 478001, at *6 (D. Mass. Mar. 1, 2005) ("[T]he law is pretty much of the view that there is no reasonable expectation of privacy in driveways, walkways, and porches that lead to the front door of a dwelling, and unless unusual precautions are taken, these approaches are considered open to the public, including the police.").  Compare United States v. Diehl, 276 F.3d 32, 35, 39 (1st Cir. 2002) (driveway was within the curtilage where it was hidden from public view, reachable only by a discontinued town road, and posted with "no trespassing" signs.).

14